UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AUTUMN MARIE PAULS,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>RICH GREEN, Sheriff of Adams County, in his official and individual capacity, and BUTCH GIBSON, jailer, in his official and individual capacity, JOHN AND JANE DOES 1-5, in their official and individual capacities,<br><br>　　　　　　Defendants. | Case No. 4:08-cv-00337-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

The following motions are pending before the Court in this matter:

(1)　　Defendants Rich Green and Adams County's Motion for Summary Judgment (Dkt. 41);

(2)　　Defendant Butch Gibson's Motion for Partial Summary Judgment (Dkt. 45);

(3)　　Defendant Gibson's Motion to Dismiss (Dkt. 47), joined in by defendants Adams County and Green (Dkt. 65);

(4)　　Plaintiff's Motion to Compel and for Evidentiary Sanctions (Dkt. 53); and

(5)　　Defendant Green and Adams County's Motion to Strike Affidavit of Dr. Terry Kupers. (Dkt. 59). Defendant Butch Gibson joined in this motion (Dkt. 63) and Green and Adams County thereafter joined Gibson's joinder. (Dkt. 65).

The Court finds that the decisional process would not be aided by oral argument, and it will resolve these motions after consideration of the parties' written submissions. D. Idaho L. Civ. R. 7.1(d).

For the reasons set forth below, the Court will deny the motions to dismiss and grant in part and deny in part the summary judgment motions. The Court will grant in part and deny as moot in part the motion to strike. The Court will grant in part and deny in part the motion for evidentiary sanctions.

## BACKGROUND

Plaintiff Autumn Pauls was incarcerated at Adams County Jail during the period September 2005 to October 2006. *See* Dkt. 41-2 ¶ 7. Pauls testified that during the final seven or so days before she left Adams County Jail, Officer Butch Gibson used his power and authority to coerce her into participating in sexual acts with him. *Id. ¶* 33. Shortly thereafter, Pauls was transferred to a state prison in Pocatello, Idaho.

Adams County hired Gibson as a full-time detention officer in March 2006. Gibson resigned just six months later, on October 1, 2006. His last day of employment roughly coincided with Pauls' October 3, 2006 transfer to Pocatello. *See* Dkt. 41-2, ¶¶ 17, 26.

After Gibson and Pauls left Adams County Jail, two female inmates told a jail staff member that a former inmate had had "inappropriate contact" with Gibson. Dkt. 41-2, ¶ 24. The Adams County Sheriff's Office requested that the Idaho State Police investigate the allegations. The police investigated the matter and prepared a report,

which was forwarded to the Adams County Prosecutor.  Dkt. 41-2 ¶ 24-25.

During the police investigation, Pauls denied any inappropriate contact with Gibson.  Dkt. 43-4, Pauls Dep., at 56-57.  She further indicated that she did not report the assault to anyone at Adams County Jail.  Dkt. 41-2 ¶ 30.

Around eighteen months later, in August 2008, Pauls sued defendants under 42 U.S.C. § 1983, alleging violations of her Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  She also alleges supplemental state-law claims.  Plaintiff seeks compensatory and punitive damages.  Dkt. 37.

## MOTION TO DISMISS

All defendants argue that Pauls' § 1983 action should be dismissed because she failed to exhaust her administrative remedies before bringing suit.

## 1.       The Exhaustion Requirement

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).  This requirement is intended to give "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court."  *Id*. at 204.

Proper exhaustion is required, meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules,

including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). By its plain terms, however, the PLRA requires prisoners to exhaust only those avenues of relief that are "available" to them. 42 U.S.C. § 1997a(e).

A claim that a prisoner failed to exhaust administrative remedies is an affirmative defense that should be brought as an unenumerated motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2002). The district court may consider matters outside of the pleadings and can resolve disputed issues of fact, if necessary. *Id.* at 1119-20. Defendants bear the burden of raising and proving the absence of exhaustion. *See, e.g., Jones*, 549 U.S. at 216.

**2.     Availability of Administrative Procedures**

Defendants argue that Pauls failed to exhaust her administrative remedies because she never reported the alleged sexual assault to anyone, either while incarcerated at Adams County Jail or any time thereafter. Pauls argues that exhaustion is not required because, among other things, she was transferred from Adams County Jail to an Idaho state prison within a few days of the assaults. *See* Dkt. 57, at 8, 12.

The PLRA does not expressly address an inmate's obligation to grieve violations of constitutional rights in one facility when incarcerated in another, or under what circumstances the grievance procedure in one facility should be considered "available" to an inmate who has been transferred to another. The cases are not uniform on this topic,

and the Ninth Circuit has yet to address the precise issue faced by this Court.[1]

Many courts hold that the mere fact of a transfer does not affect a prisoner's obligation to exhaust his administrative remedies before filing suit. *See, e.g., Napier v. Laurel County*, 636 F.3d 218, 223-24 (6th Cir. 2011); *Medina-Claudio v. Rodriguez-Mateo*, 292 F.3d 31, 35 (1st Cir. 2002). Others are more lenient (particularly in the case of a transfer from a county facility to a state facility), concluding that such a transfer may render administrative remedies at the transferor facility unavailable. *See Rodriguez v. Westchester County Jail Correctional Dep't,* 372 F.3d 485, 488 (2d Cir. 2004); *Bradley v. Washington*, 441 F. Supp. 2d 97, 102-03 (D.D.C. 2006).

Under either approach, the analytical starting point is the transferor jail's regulations. Some courts hold that the regulations need not explicitly allow transferred inmates to file grievances. Instead, the key is whether they prohibit transferred inmates from using grievance procedures. *See, e.g., Napier,* 636 F.3d at 223; *Medina-Claudio*, 292 F.3d at 35 ("Nothing in the regulations explicitly prohibits Medina-Claudio from filing an administrative complaint while temporarily housed in another facility."). The Sixth Circuit, in particular, rejected any notion that the regulations must expressly provide

---

[1] Most courts agree that grievance procedures at a transferor facility remain available to prisoners transferred to a different prison if both prisons are administered by the same agency. *See, e.g., Flournoy v. Schomig*, 152 Fed. Appx. 535, 537-38 (7th Cir. 2005) (unpublished order) (PLRA's exhaustion requirement not satisfied where administrative procedures provided for the pursuit of a grievance following prisoner's transfer to another state institution); *Carini v. Austin*, 2008 WL 151555, at *4 (S.D.N.Y. Jan. 14, 2008); *Finger v. Superintendent McFinnis*, 2004 WL 1367506, at *4 (S.D.N.Y. June 16, 2004). Those cases are inapplicable here, as Pauls was transferred from a county jail to a state prison.

a mechanism for filing a grievance after a transfer. *Napier*, 663 F.3d at 223 ("a jail's grievance policies need not explicitly provide for all possible scenarios in which a prisoner may seek to file a grievance").

The grievance procedures at Adams County Jail do not expressly prohibit or allow grievances to be filed after an inmate has transferred to another facility. They are silent on that topic. The relevant rule provides:

> If you are sexually assaulted, immediately report it to a staff member or more than one staff member if necessary. You may also kite the Jail Commander or Sheriff directly or any other staff member you feel comfortable reporting this to. You may also utilize the inmate grievance procedure. Do not clean yourself, brush your teeth, wash your clothes or do anything else that could destroy evidence of the assault. The sooner you report the assault the better the chances evidence can be obtained that will help prove the assault.

Dkt. 47-2, at 13 (Inmate Handbook).

Nevertheless, Sheriff Green testified that Adams County Jail procedures were not available to inmates after they are transferred. He stated, "We don't have a policy" for reporting sexual abuse once an inmate has transferred outside the facility. *See* Dkt. 52-2, Green Dep., at 22.[2] He also testified that Adams County did not offer any assistance to

---

[2]  The exchange on this point was somewhat convoluted, but Sheriff Green plainly testified that there are no procedures for prisoners to report sexual abuse once they are "outside the agency" or "outside the facility." The pertinent line of questioning is as follows:

> Q:  Okay. Do you have a policy or procedure set for inmates to report sexual abuse outside of the agency?
> A:  No.
> Q:  Like to the prosecutor's office, for example, or State Police?
> A:  We don't have a policy with regard to that.
> Q:  Okay.

Pauls after learning of the incident because Pauls had been transferred.  *See* Dkt. 52-2, Green Dep., at p. 86, ln. 21 to p. 87, ln. 1 ("Pauls was not in our custody at the time this incident was discovered, and so therefore there was no opportunity for Adams County to offer any assistance.").  More generally, Sheriff Green testified that there is no memorandum of understanding between Adams County Jail and the state prison system. *See* Dkt. 52-2, Green Dep., at 44-47 (answering general questions regarding how and why Adams County houses state prisoners); *cf. Parmer v. Idaho Correctional Corp.,* 2009 WL 735646, at *4 (D. Idaho Mar. 19, 2009) (administrative procedures at transferor facility deemed "available" to prisoner who was transferred eight days after the deadline to file a grievance; inter-facility agreement allowed grievances filed at first prison to be forwarded to transferee prison).

Under this record, defendants have not shown that Adams County Jail's administrative procedures remained available to Ms. Pauls after she was transferred to state prison.

Defendants also argue that Pauls failed to exhaust her administrative remedies at Adams County Jail before she was transferred to state prison.  As indicated, Pauls was

---

A:    Once they're outside the facility you've asked, is that correct?
Q:    Whether they could report to someone outside the facility through the process?
A:    Oh, oh, while they're in custody?
Q:    Right.
A:    Oh, yeah, yeah, oh, yeah, yeah, they're advised of that.

Dkt. 52-2, at p. 76, ln. 22 to p. 77, ln. 12.

transferred from the jail to prison roughly two days after the last assault and seven days

after the first assault.[3] (Recall that Officer Gibson's last day was October 1, 2006; Pauls

left the jail on October 3, 2006; and the sexual assaults occurred in seven or so days

before Pauls left Adams County.) Although the inmate handbook advises inmates to

"immediately" report a sexual assault, the rules do not prevent an inmate from reporting

an assault after that; there is no stated deadline. Dkt. 47-2, at 13. Nor is there any

evidence that Adams County Jail would have treated such a claim as time-barred. Indeed,

upon learning of the alleged improprieties, Sheriff Green quickly turned the matter over

to the Idaho State Police for an investigation. Further, inmates are allowed to use the

grievance procedure to report a sexual assault, and there is no evidence indicating that

any deadline to grieve the assault expired before Pauls was transferred. There is also no

indication that Pauls was given direction on reporting incidents after the transfer.

Under these circumstances, Pauls did not have an adequate opportunity to grieve

the sexual assault at Adams County Jail. *See Hartry v. Suffolk County*, 755 F. Supp. 2d

422, 433-34 (E.D.N.Y. 2010) (inmate did not have opportunity to grieve incident that

took place two days before he was transferred to another facility; the inmate handbook

allowed five days to file grievance); *Bradley*, 441 F. Supp. 2d at 102 (procedures at

transferor facility not "available" to prisoner for July 31 and August 8 incidents where

---

[3] Pauls testified that she had unwanted sexual contact with Gibson on multiple occasions. *See, e.g.,* Dkt. 43-3, at p. 34, lns. 20-24. She also testified that her first unwanted sexual contact with Gibson occurred during the week before she left Adams County Jail. *See id.* at p. 25, lns. 3-9.

inmate was transferred on August 8); *Leacock v. City of New York*, 2005 WL 323723, at
*5 (S.D.N.Y. Feb. 10, 2005) (inmate's transfer deprived her of available administrative
remedies where incident took place one day before transfer); *Baker v. Andes*, 2005 WL
1140725, at *6 (E.D. Ky. 2005) (inmate transferred the same day the incident occurred
not obligated to complete grievance process); *cf. Berry v. Kerik*, 366 F.3d 85, 88 n.3 (2d
Cir. 2004) (administrative procedures available to prisoner who had months in which to
pursue grievance; noting, however, that the Court had "no occasion to consider the
exhaustion requirement in situations where only a brief interval elapses between the
episode giving rise to the prisoner's transfer to the custody of another jurisdiction."). The
Court therefore denies defendants' motion to dismiss and will turn to the pending
summary judgment motions.

**MOTIONS FOR SUMMARY JUDGMENT**

**1.      Standard Applicable to Motions for Summary Judgment**

Summary judgment is appropriate where "the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there is no genuine issue as to
any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(c). "One of the principal purposes of the summary judgment rule is to isolate
and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317,
323-24 (1986). It is not a "disfavored procedural shortcut," but is instead the "principal
tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented

from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those which may affect the outcome of the case. *See id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). In addition, the Court "must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to

support a jury verdict in her favor. *Anderson*, 477 U.S. at 256-57. The non-moving party must go beyond the pleadings and show by "affidavits, or by the 'depositions, answers to interrogatories, or admissions on file'" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court "is not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995).

## 2.     The Federal Claims

Sheriff Green and Adams County move for summary judgment on all of Pauls' federal claims. Gibson moves for summary judgment of Pauls' claims for violations of her Fourth, Fifth, and Fourteenth Amendment rights. He contends Pauls' allegations are properly analyzed under the Eighth Amendment. Dkt. 45-5, at 4. Gibson also moves for summary adjudication of Pauls' request for punitive damages against him in his official capacity.[4]

---

[4] Gibson has not requested summary adjudication of Pauls' request for punitive damages against him in his individual capacity.

The Court will grant Gibson's motion for summary judgment of her Fourth, Fifth and Fourteenth Amendment claims as Pauls has not meaningfully opposed that motion. Rather, she indicates that her claims are "primarily based upon" the Eighth Amendment. Dkt. 56, at 4; *see also Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000). The Court will also grant Gibson's request for summary adjudication of Pauls' request for punitive damages against him in his official capacity. *See Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996) (error to award punitive damages against public employees in their official capacities).

This leaves the issue of whether Adams County (and Sheriff Green in his official capacity[5]) are entitled to summary judgment of Pauls' Eighth Amendment claim.

## A.  Entity Liability

Prisoners have an Eighth Amendment right to be free from sexual abuse. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Schwenk*, 204 F.3d at 1197. Title 42 U.S.C. § 1983 provides a civil cause of action against any "person" who subjects another to the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

Municipalities and other local governments are considered "persons" under § 1983 and therefore may be liable for causing a constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). But local governments are responsible only for

---

[5]  A suit against individual defendants in their official capacity is essentially the same as a suit against the County. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978).

"'their *own* illegal acts.'  They are not vicariously liable under § 1983 for their employees' actions."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (internal citations omitted).

Section 1983 plaintiffs seeking to impose *Monell* liability on local governments must prove that an "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S. at 691; *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010).  Further, the policy must be the "moving force" behind plaintiff's alleged constitutional violation.  *See Mabe v. San Bernardino County Dep't of Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

A municipality's failure to train or supervise its employees can be an unconstitutional "policy" for purposes of § 1983 liability.  *City of Canton v. Harris*, 489 U.S. 378, 387 (1989).  To be actionable under § 1983, the failure to train or supervise must amount to "'deliberate indifference to the rights of persons' with whom those employees are likely to come into contact."  *Lee v. City of Los Angeles*,  250 F.3d 668, 681 (9th Cir. 2001) (quoting *City of Canton*, 489 U.S. at 388-89).

"[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 410 (1997).  For these consequences to be known or obvious, it is "'ordinarily necessary'" that there be a pattern of similar constitutional violations by untrained employees*.  Connick*, 131 S. Ct. at 1360 (quoting *Brown*, 520

U.S. at 409). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

That said, there is a "narrow range of circumstances" in which a pattern of similar violations may not be necessary. *Brown*, 520 U.S. at 398 (citing *Canton*, 489 U.S. at 390 n.10). Local governments may be liable for a single incident if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can be reasonably said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The oft-repeated example – hypothesized by the Supreme Court in *Canton* – is a city that arms its police officers but fails to train them on the proper use of deadly force despite knowing "to a moral certainty" that officers will be required to capture fleeing felons. *Id.* at 390 n.10.

Viewing the evidence in the light most favorable to Pauls, the Court concludes that Pauls has failed to raise a genuine issue of material fact as to whether Adams County or Sheriff Green, in his official capacity, were deliberately indifferent in training or supervising jail employees.

Preliminarily, the failure-to-train theory is particularly tenuous in this case because so many courts have held that no training is required to teach employees *not* to commit sexual assaults. *See, e.g.*, *Barney v. Pulsipher*, 143 F.3d 1299, 1308 (10th Cir. 1998) ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."); *Andrews v. Fowler*, 98 F.3d 1069, 1077

(8th Cir. 1996) ("we cannot conclude that there was a patently obvious need for the city to specifically train officers not to rape young women"); *Campbell v. Anderson County*, 695 F. Supp. 2d 764, 774 (E.D. Tenn. 2010) ("the proper course of conduct – refraining from sexual assault and rape – is patent and obvious; structure[d] training programs are not required to instill it"); *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1009 (D. Ariz. 2009) ("a municipality is not deliberately indifferent in failing to train law enforcement officers to not sexually assault those with whom they come into contact").

But even in the absence of such holdings, Pauls has failed to create a genuine issue of material fact as to a deficiency in Adams County's training program.

First, Adams County provides general training to its officers, as well as specific training regarding the statutory prohibition against sexual contact with inmates. *See* Dkt. 41-3, at 2-3. Pauls has not controverted facts establishing Adams County's program-wide training efforts. *See Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (inadequate training a basis of liability if there is a "deficient training program, 'intended to apply over time to multiple employees'") (citing *Brown*, 520 U.S. at 407). Instead, she focuses on Gibson, asserting that he received no training regarding sexual contacts with inmates and only "some training, mostly on the job training" regarding general duties. *See* Dkt. 51-2, Plaintiff's Separate Statement, at 2-4 (item nos. 14, 15, 19). But even assuming this is true – and further assuming an officer needs training to refrain from sexually assaulting an inmate – it does not create a genuine issue of material fact

regarding Adams County's overall training program. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91; *see also Alexander v. City of San Francisco*, 29 F.3d 1355, 1368 (9th Cir. 1994) (a single officer's lack of training insufficient to create a genuine issue of fact as to *Monell* liability).

Second, there is no evidence of a pattern of prior, similar abuses at Adams County Jail that would provide actual or constructive notice of the need to implement different training or supervisory practices to prevent officers from sexually assaulting inmates.

After Pauls filed this action, another inmate came forward, stating Gibson had sexually assaulted her. But this inmate had not previously reported the alleged assault, and no jail staff observed it. Additionally, in December 2005, there was an investigation regarding alleged sexual contact between an inmate and a jailer. The investigators apparently concluded there was no merit to the allegation. *See* Dkt. 52-2, Green Dep., at p.79, ln. 12 to p. 81, ln. 20 & p. 82, ln. 17-24. These two events – which are not cited in plaintiff's brief or separate statement of facts in any event – do not create the requisite "pattern" of prior abuses. *See, e.g., Sexton v. Kenton County Detention Ctr.*, 702 F. Supp. 2d 784, 791-92 (E.D. Ky. 2010) (granting summary judgment where there was no evidence of a pattern of sexual abuse by the individual defendant or of a custom of inaction when inmates alleged sexual assault).

Additionally, any failure to train jailers to refrain from sexually assaulting inmates does not fall within the narrow range of *Canton's* hypothesized single-incident liability. The obvious need for specific training that was present in the *Canton* hypothesis is absent here: as discussed, jailers do not need specific, structured training to know they should refrain from sexually assaulting inmates.

Pauls, however, argues that a training handout "demonstrated [Adams County's] awareness of the substantial risk of serious harm faced by inmates." Dkt. 51, at 10. The handout, entitled *Recognizing and Putting the Brakes On: Prohibited Staff/Inmate Contact*, apparently originated from a November 2003 training session presented by the Idaho Counties Risk Management Program in connection with Peace Officer Standard Training (POST). Dkt. 52-4, at 18-24; *see also* Dkt. 41-2 ¶¶ 12-13, at 3. One of the stated purposes of the training, as stated in the handout, is to "*Recognize* that prohibited staff-inmate contact is a *serious problem*." Dkt. 52-4, at 20 (emphasis in original). The handout goes on to list various "myths," including, for example, "'It doesn't happen in our jail," and "No one will ever find out." *Id.* The handout concludes with a lengthy checklist of "What to Watch out For & What To Do." *Id.* at 21-24.

Pauls asserts that Adams County failed to follow all recommendations in the training handout, particularly regarding the training and supervision of Gibson. For example, the handout states, "Jails must be adequately funded and staffed" and counsels against allowing non-POST-certified employees to operate jails alone. Dkt. 52-4, at 21.

Pauls indicates that, contrary to these recommendations, Gibson, who was not POST-certified, was sometimes allowed to work in the jail alone. *See* Dkt. 51, at 10-11. Pauls also points out that Officer Gibson's training was not documented in his file and that he did not receive sexual harassment training. *Id.* at 11.

The Court rejects Pauls' argument, which, in broad strokes, is that sexual assault of an inmate would be a "plainly obvious" consequence of Adams County's failure to follow each recommendation in this handout. As the Supreme Court has stated, "'[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.'" *Clouthier*, 591 F.3d at 1250 (citing *Canton*, 498 U.S. at 392).

Further, the training handout was not specific to Adams County; as discussed, there was no pattern of incidents at Adams County Jail that would provide actual or constructive notice that allowing a non-POST-certified employee to operate the jail alone would obviously result in the sexual assault of an inmate. The Tenth Circuit rejected a similar argument in *Barney v. Pulsipher*:

> The record reveals no previous incidents of sexual harassment or assault of female inmates at Box Elder County Jail which would provide actual or constructive notice to the County that its one-jailer policy and failure to adopt certain policies would result in the specific injuries alleged here. Nor are we persuaded that a plainly obvious consequence of failing to adopt such policies or having one male jailer on duty is the sexual assault of female inmates.

143 F.3d at 1309 n.8; *cf. also Clouthier*, 591 F.3d at 1253 (affirming summary judgment in favor of a county because plaintiffs "failed to adduce evidence that the County was on actual or constructive notice of a problem with mental health understaffing that would amount to a constitutional tort").

On this record, there is insufficient evidence for a jury to conclude that Adams County was on notice that more or different training or supervision was necessary to prevent jailers from sexually assaulting inmates.

Finally, as discussed more thoroughly below, the affidavit of Dr. Kupers does not create an issue of material fact as to *Monell* liability. Dr. Kupers' report is filled with impermissibly conclusory assertions. For example, Dr. Kupers opines that "[t]here was deliberate indifference to the rights and safety of the prisoners in the face of well known risks" and that "[c]ulpability for the sexual assaults is shared by the entire line of command in the Sheriff's Office." Dkt. 51-4, at 3, 6. These assertions are not supported in the record and will not forestall summary judgment. Adams County and Sheriff Green, in his official capacity, are entitled to summary judgment of Pauls' § 1983 action.

**B.    Individual Liability**

Sheriff Green, in his individual capacity, is also entitled to summary judgment of the § 1983 action.

To impose § 1983 liability against Sheriff Green in his individual capacity, Pauls must demonstrate "culpable action, or inaction, directly attributed to" him. *Starr v. Baca*,

—F.3d—, 2011 WL 2988827, at *2 (9th Cir. July 25, 2011). To be sure, the sheriff does not have to be "'directly and personally involved in the same way as are the individual officers who are on the scene inflicting the constitutional injury.'" *Id.* (citation omitted). Rather, his participation could include his own culpable action or inaction in, among other things, the training, supervision, or control of his subordinates. *See id.* (citing *Larez v. City of Los Angeles*, 946 F.2d 630, 645-46 (9th Cir. 1991)). The charged official must, however, have a "sufficiently culpable state of mind," meaning that the official must exhibit "deliberate indifference"[6] to a substantial risk of serious harm to an inmate. *Farmer*, 511 U.S. at 834. Plaintiffs must also show a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

As discussed above, Pauls' failure-to-train theory relies on the alleged failure to train officer Gibson. There is no evidence of a widespread failure to train, or a deficiency in the existing training program. Failure to train one officer is akin to negligence. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007) ("absent evidence of a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be classified as mere negligence on the part of the municipal defendant – a

---

[6] The deliberate-indifference standard applied here differs from the deliberate-indifference standard applied in the entity-liability context. *See, e.g., Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.8 (9th Cir. 2002) (noting that the deliberate-indifference standards "somewhat confusingly" differ). For individuals, the standard is a subjective one. *See Farmer*, 511 U.S. at 840-41. For entities, it is an objective standard. *See Canton*, 489 U.S. at 389-90.

much lower standard of fault than deliberate indifference'") (citation omitted).[7]  The

standard for imposing individual liability requires more than mere negligence.  *Id.*

As for the failure to supervise theory, for the reasons stated above, there is no

evidence that the Sheriff was on notice that supervisory practices at Adams County Jail

were inadequate and likely to result in a constitutional violation.  Sheriff Green is

therefore entitled to summary judgment of the Eighth Amendment claim in his individual

capacity.[8]

### 3.    State-Law Claims[9]

In addition to her federal civil rights claim, Pauls has sued all defendants for

intentional and negligent infliction of emotional distress and negligence.  *See* Dkt.  37, at

5-6.  Individual defendants Gibson and Sheriff Green argue that Pauls cannot pursue these

claims because she failed to post the bond required by Idaho Code § 6-610.  Idaho Code

---

[7]  *Blankenhorn* is a municipal-liability case but this failure-to-train concept has equal applicability to a supervisory individual-capacity claim.  *See Jarbo v. County of Orange*, 2010 WL 3584440, at *14 n.9 (C.D. Cal. Aug 30, 2010).

[8]  Given this ruling, it is unnecessary to address Sheriff Green's qualified-immunity defense.  *See Thomas v. Bd. of Educ.*, 759 F. Supp. 2d 477, 495 n.19 (D. Del. 2010) (citing cases; discussing the relationship between supervisory liability and qualified immunity).

[9]  Adams County and Green initially argued that they were entitled to summary judgment of Pauls' state-law claims because Pauls failed to timely notify Adams County of these claims, as required by the Idaho Tort Claims Act.  *See* Idaho Code § 6-906.  Later, these defendants discovered that Pauls had, in fact, timely notified Adams County and accordingly withdrew that argument as support for their summary-judgment motion.  *See* Dkt. 49.  The result appears to be that now only the individual defendants, and not Adams County, request summary judgment of Pauls' state-law claims.  If this is not the case, additional time for summary-judgment motions may be requested at the scheduling conference.

§ 6-610 applies to actions arising out of a law enforcement officers' official duties and requires a plaintiff to post a bond "as a condition precedent" to suing an officer. Pauls did not file a bond, but contends that defendants are estopped from raising the bond issue.

This argument lacks merit. The moving defendants raised Pauls' failure to file a bond as affirmative defenses and filed dispositive motions within applicable deadlines. The key authority Pauls relies upon, *Garren v. Butigan*, 509 P.2d 340 (Idaho 1973), is distinguishable because the defendant in that case failed to raise the bond requirement as an affirmative defense. *Id.* at 359.

Alternatively, Pauls argues that she should be allowed to seek relief from the bond requirement due to indigence. This Court, however, has already denied Pauls' request to proceed in forma pauperis. Dkt. 5, at 7 ("it appears that Plaintiff has sufficient funds to afford the costs of ligation"). Pauls' contentions that her "circumstances have changed" and that "[f]ederal law should control over whether she should be allowed to proceed without filing an onerous bond" are unavailing. Dkt. 51, at 7.

First, Pauls' invocation of "federal law" is based upon her discussion of *Pugsley v. Cole*, 2005 WL 1513112 (D. Idaho June 27, 2005). *Pugsley* held that an indigent prisoner's state-law claims will not be barred for failure to post the requisite bond. *Id.* at *7. *Pugsley* is not applicable here because Pauls is not indigent. Further, the Idaho Court of Appeals has limited *Pugsley* to its specific facts. *See Hyde v. Fisher*, 152 P.3d 653, 656 (Idaho Ct. App. 2007) (adopting *Pugsley)*; *Beehler v. Fremont County*, 182 P.3d 713,

717 (Idaho Ct. App. 2008) ("*Hyde* applies only to prisoners who are declared indigent for the purposes of litigation after filing the appropriate motion and affidavit; it does not apply to the Beehlers, as they are not incarcerated.").

Pauls attempts to fit within *Pugsley* by claiming that her circumstances have changed and that she is now "potentially" indigent. But there is no affidavit to support that claim. Moreover, the time to analyze plaintiff's financial situation is when the case is filed. *See* Idaho Code § 31-3220A(2) (prisoners seeking a waiver of court fees "shall file . . . [the requisite motion and affidavit] *at the time of filing an action*; . . . .") (emphasis added); *see also Athay v. Stacey*, 196 P.3d 325, 331 (Idaho 2008) ("Plaintiff does not point to any sworn statement in the record showing that he was indigent *when he filed this case*.") (emphasis added); *cf. Allied Bail Bonds, Inc. v. County of Kootenai*, —P.3d—, 2011 WL 2652475, at *5 (Idaho July 8, 2011) (trial court properly dismissed amended complaint for failure to post bond upon sheriff's objection that plaintiff filed a bond one day after filing the original complaint)

Under these authorities, Pauls' failure to file the bond called for under Idaho Code § 6-610 mandates dismissal of her state-law claims against Gibson and Sheriff Green.[10]

## DEFENDANTS' MOTION TO STRIKE EXPERT AFFIDAVIT

Plaintiff relies, in part, on the affidavit of Dr. Terry Kupers in her effort to

---

[10] The Court thus has no need to address these defendants' other arguments as to why state-law claims should be dismissed. *See* Dkt. 41-1, at 18 (Sheriff Green argues he is not liable for negligent infliction of emotional distress because did not breach a duty owed to plaintiff); Dkt. 45-5, at 3 (Gibson argues plaintiff cannot recover punitive damages under state law).

withstand the pending dispositive motions.  *See* Dkt. 54-1.  All defendants have moved to strike Dr. Kupers' affidavit because it was not timely provided.  Defendants also contend that Dr. Kupers' affidavit is inadmissible in any event.  *See* Dkt. 59-1; Dkt. 63.

## 1.    Timeliness

Turning first to the timeliness issue, the Court's scheduling order in this matter requires all discovery to be completed by November 29, 2010, and all dispositive motions to be filed by December 28, 2010.  Dkt. 40, at 3, 5.  The order does not separately address expert discovery.[11]

Pauls did not identify any expert until the last day to conduct discovery – November 29, 2010 – despite having been asked to identify experts in discovery requests propounded in March.[12]  *See* Dkt. 63-2, at 1-2, 7-8.  Plaintiff did not supply Dr. Kupers' report until January 19, 2011, almost two months after the discovery cutoff and after the defendants had filed their dispositive motions.  *See* Dkt. 51-4.

Pauls argues that the expert's report was not actually late.  Alternatively, she argues that if the report was late, it should not be stricken because the failure to comply with discovery deadlines was "substantially justified."

---

[11]  The Court often does not include separate expert discovery deadlines in scheduling orders related to prisoner civil rights matters.

[12]  In response to interrogatories and document requests asking for the identity of witnesses and production of export reports and related materials, Pauls provided responses along the following lines: "No such information is available at this time; this answer may be supplemented as necessary."  Dkt. 63-3, at 5.

## A.    The Legal Standard Applicable to this Motion

Rule 37(c) of the Federal Rules of Civil Procedure provides for the exclusion of an expert witness if the discovery rules have not been complied with.  It states, in relevant part:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.  In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (A)    may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
>
> (B)    may inform the jury of the party's failure; and
>
> (C)    may impose other appropriate sanctions, . . . .

Fed. R. Civ. P. 37(c)(1).  Thus, Pauls has the burden of proving she had "substantial justification" for the late filing or that it was harmless.  *See Yeti vy Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

## B.    Analysis

Pauls initially argues that the report was not, in fact, late because no trial date has been set in this case and applicable rules require that expert discovery be conducted 90 or 120 days before trial.  Dkt. 67, at 2-3 (*citing* Fed. R. Civ. P. 26(a)(2)(D)(I) (absent court order or stipulation, expert testimony must be disclosed "at least 90 days before the date set for trial or for the case to be ready for trial") *and* Former D. Idaho L. Civ. R. 26.2(b)

(expert testimony must be disclosed 120 days before the scheduled trial date).[13]

The Court rejects this argument. Although the scheduling order did not explicitly address expert discovery, it contemplated that all discovery would be completed by November 29, 2010, and included a subsequent deadline for filing all dispositive motions. If plaintiff needed additional time to conduct any discovery, including expert discovery, the proper course was to come to an agreement with opposing counsel and file a stipulation for this Court's approval or, alternatively, to file a motion with this Court. She did not. The expert report was not timely filed and is therefore within the purview of Rule 37 sanctions. *See Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (upholding district court's decision to strike late-filed expert affidavit in its entirety).

Pauls' second argument – that she was substantially justified in the late filing – is more convincing. Here, Pauls argues that defendants Adams County and Sheriff Green did not timely produce all relevant documents, and that this failure delayed the expert's ability to form his opinions and prepare his report. As support for this argument, Pauls

---

[13] Pauls cites to a former version of the local rule, which has since been modified to eliminate the reference to the 120-day period before trial. The new rule, effective January 1, 2011, omits this reference. The relevant portion of the revised rule, marked to show changes from the previous rule, is as follows:

> As a general rule, the Court will set the time for the disclosure of expert testimony during the Rule 16.1 scheduling conference. In the event the Court does not designate the time for disclosure of expert testimony, it must be disclosed at least one hundred twenty (120) days before the scheduled trial date, or if the evidence is intended solely to contradict or rebut evidence on the same subject identified by another party, within thirty (30) days after the disclosure made by such other party.

Local Rule 26.2(b).

filed Sheriff Green and Adams County's supplemental document production index.  *See*

Dkt. 67-3.  This index indicates that at least some documents were not timely produced.[14]

Because Adams County and Sheriff Green had at least some hand in the delay, the

Court finds that plaintiff's counsel was substantially justified in the late submission of Dr.

Kupers' report.  Further, in some respects, the late filing is harmless.  Although defendants

correctly point out that they filed their dispositive motions before Dr. Kupers' report was

filed, the Court decided the summary judgment motions in defendants' favor and decided

the motion to dismiss without relying upon Dr. Kupers' opinion.

Because there will be a trial in this matter, the Court will re-open discovery for the

sole purpose of allowing defendants to depose Dr. Kupers and for defendants to obtain

their own experts.

**2.  Admissibility of Dr. Kupers' Affidavit**

Defendants have also objected to Dr. Kupers' affidavit because, among other

things, it contains impermissible legal conclusions, factually unsupported opinions, and

irrelevant opinions.  *See* Dkt. 59-1; Dkt. 63.

---

[14]  The parties dispute whether a key document – the Adams County Jail Standards and
Policy Manual – was timely produced.  Pauls claims this document was produced for the first
time on December 16, 2010, after the discovery cutoff.  Green and Adams County assert that the
document was timely produced in October 2010.  In fact, it appears that Sheriff Green was
questioned on this document in his November 2010 deposition.  *See* Dkt. 52-2, p. 24, ln. 20 to p.
26, ln. 11.  Presumably, the document produced after the discovery cutoff, entitled "Adams
County Jail Standards and Policy Manual – last updated 2010," is an updated version that was
not previously available.  Adams County and Sheriff Green have not so argued, however.
Nevertheless, even assuming that all jail policy manuals were timely produced, the index reveals
other documents that were not.

Dr. Kupers' 55-page affidavit (including the attached report) contains opinions on various different issues. *See* Dkt. 51-4. Broadly speaking, the opinions can be separated into two categories: (1) opinions as to whether Adams County Jail had proper procedures for inmates to report sexual assaults by jail staff (the "exhaustion-related opinions"); and (2) all other opinions, including opinions as to whether Adams County Jail (and Sheriff Green) exhibited deliberate indifference in training or supervising jail staff.

**A.      Dr. Kupers' Opinions Relevant to the Motions to Dismiss**

Pauls relied on the first category of opinions – the exhaustion-related opinions – in opposing defendants' motions to dismiss. *See* Dkt. 57, at 4-5 (opposition memorandum quoting at length from Dr. Kupers' affidavit). The ultimate point of these opinions is clear: Dr. Kupers is offering an explanation for Pauls' failure to report the alleged assault. The upshot of his opinion is that the administrative procedures at Adams County Jail were not available to Pauls. *See, e.g.,* Dkt. 51-4 ¶ 16, at 5.

The Court reached the same conclusion – for different reasons and without reliance on Dr. Kupers' opinions – in denying defendants' motions to dismiss Pauls' § 1983 action for failure to exhaust administrative remedies. Consequently, the admissibility of Dr. Kupers' exhaustion-related opinions is moot and the motion to strike these opinions will be denied on that basis. This leaves the Court with the task of determining whether Dr. Kupers' remaining opinions should be stricken.

**B.      Dr. Kupers' Opinions Relevant to the Summary judgment Motion**

In opposing the summary judgment motions, Pauls does not precisely articulate which of the remaining opinions she relies upon.[15] *See* Dkt. 51, at 2-3, 12. Similarly, her opposition to the motion to strike does not engage in a careful, line-item analysis of the admissibility of the many opinions Dr. Kupers offers (at least one of which has no relevance to this action, as Pauls admits). Instead, Pauls speaks in generalities, at one point noting that "the Court can adequately parcel out what is a legal conclusion and what is his expert opinion, . . . ." Dkt. 67, at 11.

Under these circumstances, the Court will not comb the entire report but will instead address those opinions plaintiff specifically discusses in her brief or that are plainly relevant to the pending motions.

### *(1) The Relevant Legal Standard*

Expert affidavits offered in the summary judgment context are subject to Rule 56 and the Federal Rules of Evidence governing expert testimony. Rule 56 requires that affidavits supporting or opposing summary judgment "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Experts may satisfy the personal-knowledge requirement if they provide affidavits containing an opinion formed within their area of expertise and based on their own assessment or analysis of the underlying facts or data. *See Doe v. Cutter Biological, Inc.*, 971 F.2d 375, 385-86 n.10

---

[15] Dr. Kupers' report is not cited at all in Pauls' separate statement of material facts. *See* Dkt. 51-2.

(9th Cir. 1992); Fed. R. Evid. 703. The expert's affidavit must, however, explain the factual basis and methodology used to arrive at the opinion, although the affidavit need not include all of the facts and data relied on in forming the opinion. *See Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316-17 (9th Cir. 1985).

An expert's conclusory opinions, set forth in an affidavit, do not meet the requirements of Rule 56(e). *Clouthier*, 591 F.3d at 1253. In the context of summary judgment motions, the factual predicate of an expert's opinion must find some support in the record. *See, e.g., In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425-27 (9th Cir. 1994) (expert's "conclusory allegations" do not defeat summary judgment where the record clearly rebuts the inference the expert suggests).

Expert testimony may also "embrace[] an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a) (with exceptions not applicable here, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.") "'That said, an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.'" *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citation omitted).

### (2) *Analysis*

Dr. Kupers' report contains the following three opinions presumably aimed at avoiding summary judgment:

(1) "There was deliberate indifference to the rights and safety of the prisoners in the face of well-known risks." Dkt. 51-4 ¶ 19, at 6.

(2) "Culpability for the sexual assaults is shared by the entire line of command in the Sheriff's Office." *Id.* ¶ 9, at 3.

(3) "There was a problem in the milieu and culture of staff at Adams County Jail, such that sexual improprieties on the part of staff were easily accomplished and rarely punished. There had been other incidents involving other inmates and staff members. This was not limited to the unacceptable practice of leaving a relatively untrained male staff to guard women inmates, but also there were other failures in carrying out duties that made the sexual assaults possible and made it difficult for inmates to grieve when assaulted." *Id.* ¶ 4, at 10.

None of these statements is sufficient to create a genuine issue of material fact. The first two are impermissible conclusions. *See, e.g., Clouthier*, 591 F.3d at 1252 (expert's conclusory assertion of an "'inadequacy in training which appears to be purposely indifferent . . . .'" insufficient to avoid summary judgment); *Salas v. Carpenter*, 980 F.2d 299, 304-05 (5th Cir. 1992) (expert's opinion that county sheriff acted with "conscious disregard" inadmissible summary judgment evidence).

As for the third, there is no factual predicate in the record for Dr. Kupers' sweeping conclusion that "sexual improprieties on the part of staff were easily accomplished and rarely punished." The record reveals that the "other incidents involving other inmates and staff members" presumably include: (1) an internal investigation in 2005; (2) testimony from an inmate who came forward during the pendency of this litigation, indicating Gibson assaulted her but that she had not reported it; (3) testimony from other inmates who stated Gibson made sexually suggestive comments or gestures; and (4) testimony

from another inmate who stated Pauls had kissed a different officer. These events do not support the broad inference that sexual improprieties were both easily accomplished and rarely punished. *See Walton v. U.S. Marshals Service*, 492 F.3d 998 (9th Cir. 2007) (expert's report containing no factual basis insufficient to create genuine issue of material fact).

For the foregoing reasons, the Court will strike these portions of Dr. Kupers' affidavit.[16]

## PAULS' MOTION FOR EVIDENTIARY SANCTIONS[17]

Pauls has requested evidentiary sanctions related to defendants' alleged spoliation of two pieces of evidence: (1) portions of Gibson's personnel file; and (2) recordings of interviews conducted by the Idaho State Police (ISP) during the police investigation of Gibson's contacts with Pauls. Dkt. 53.

---

[16] It was unnecessary for the Court to address Dr. Kupers' additional opinions to decide the pending summary-judgment motions. By way of example, and not limitation, Dr. Kupers opines that officer Gibson was not properly trained, and that the sexual assault was "entirely preventable had extant policies, PREA standards, and state guidelines been properly followed." Dkt. 51-4 ¶ 13, at 4. As discussed, failure to train a single officer is insufficient to impose *Monell* liability. *See City of Canton*, 489 U.S. at 390-91. Similarly, that an incident may have been "preventable" is not the deciding factor in whether Sheriff Green or Adams County exhibited "deliberately indifferent" training or supervision. *Id.* at 392 ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a §1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").

[17] Plaintiff titles this motion as a Motion to Compel Discovery and for Sanctions or in the alternative for Sanctions Due to Spoilation of Evidence. Dkt. 53. Defendants are not refusing to produce any documents, however; they simply cannot locate the requested documents. As such, the Court will rule upon the request for sanctions. Defendants have indicated that the documents will be produced if they are found.

1. **Relevant Facts**

Pauls requested Gibson's personnel file and the police recordings during discovery. Adams County did not produce the recordings at all, and produced only portions of Gibson's personnel file. Per Sheriff Green, the following items were missing from Gibson's personnel file: Gibson's training records, his training manual, and a form entitled "acknowledgment of prohibition against sexual contact." Dkt. 60-1 ¶ 24, at 4.

Adams County has an explanation for not producing Gibson's entire personnel file. Apparently, in April 2007, shortly after Pauls filed her notice of claim with Adams County, Sheriff Green directed the jail captain, Bill Riehle, to gather pertinent documents in preparation for a potential litigation. *See* Dkt. 60-1, at 2. Although Pauls filed her original complaint in August 2008, she did not serve Sheriff Green until August 26, 2009. *Id*. at 3. (Green states that he was aware of the lawsuit earlier through hearsay. *Id*. at 1-2.) On August 20, 2009, just six days before Sheriff Green was served, Captain Riehle died of an unexpected heart attack. *Id*. at 3.

After Captain Riehle's death, Sheriff Green and his staff inventoried Captain Riehle's office but did not find all requested materials related to this lawsuit. *Id.* They found the personnel file but without the training materials described above. *See id*. at 4. Because other deputy files were not similarly disturbed, Sheriff Green speculates that Captain Riehle had put these documents aside in anticipation of litigation. *Id.*

As for the ISP audio recordings, Sheriff Green remembers tasking a jail command

officer to contact the Idaho State Police and request an investigation regarding Pauls and Officer Gibson. *Id.* at 2. He also remembers receiving the written police report in December 2006 or January 2007, but he does not recall receiving audio tapes with the report. *Id*. at 2, 4. Nevertheless, in the course of responding to discovery, defense counsel requested all information related to the ISP investigation directly from ISP. *Id*. at 3. In its response, ISP indicated that many of the interviews were recorded. *Id.* at 3-4. As indicated, Sheriff Green does not remember receiving these recordings and, in any event, has been unable to locate them. *Id.*

## 2.      Analysis

Federal trial courts have the "inherent discretionary power to make appropriate evidentiary rulings in response to destruction or spoliation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Courts may sanction parties for destruction of evidence in three ways. "First, a court can instruct the jury that it may draw an inference adverse to the party or witness responsible for destroying the evidence. Second, a court can exclude witness testimony proffered by the party responsible for destroying the evidence and based on that destroyed evidence. Finally, a court may dismiss the claim of the party destroying the evidence." *In re Napster Copyright Litig.*, 462 F. Supp. 2d 1060, 1066 (N.D. Cal. 2006) (all internal citations omitted).

As plaintiff correctly points out, a finding of bad faith is not a prerequisite to issuing sanctions. Courts may issue sanctions against a party who merely had notice that

the destroyed evidence was potentially relevant. *Glover*, 6 F.3d at 1329. A party's motive or degree of fault in destroying the evidence is relevant to what sanction, if any, is imposed. *Napster*, 462 F. Supp. 2d at 1067.

Here, Adams County had two highly relevant items of evidence go missing during the course of this litigation. The circumstances surrounding the disappearance of portions of Gibson's personnel file are believable and innocent enough. And although the innocence fades somewhat when the second item (the ISP tapes) went missing, there is still no evidence of bad faith. To be sure, the record-keeping and retention policies in place are sloppy: items such as this should not just disappear, even if a custodian of records dies immediately before a complaint is served.

Under these circumstances, sanctions are appropriate but should not be severe, given the lack of bad faith. *Cf. Med. Lab. Mgmt. Consultants v. ABC, Inc*, 306 F.3d 806, 824 (9th Cir. 2002) (district court properly relied on absence of bad faith in determining to imply no evidentiary sanction). The sanction is as follows:

*Officer Gibson's Training.* For purposes of deciding the pending summary judgment motions, the Court presumed Gibson did not receive specific training regarding prohibited guard/inmate contact. The Court further presumed that Gibson received only the training he testified to at his deposition. Pauls has not set forth evidence controverting this training and she cannot survive summary judgment by merely pointing to the County's loss of training records. *See id.* at 825 (defendant's inadvertent loss of evidence, by itself,

is not enough for plaintiff to withstand summary judgment) (citations omitted).  She must

come forward with evidence supporting her claim.  *See Kronisch v. United States*, 150

F.3d 112, 128 (2d Cir. 1998) (if a party "has produced no evidence – or utterly inadequate

evidence – in support of a given claim," the destruction of evidence "standing alone" will

not allow the party to survive summary judgment on that claim); *Byrnie v. Cromwell Bd.

of Educ.*, 243 F.3d 93, 107 (2d Cir. 2001) ("In borderline cases, an inference of spoliation,

in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action,

can allow the plaintiff to survive summary judgment.") (citation omitted).

Assuming Officer Gibson's training remains relevant at any trial of this matter, the

Court will permit an instruction allowing the jury to draw a negative inference based upon

the disappearance of portions of Gibson's personnel file.  Defendants will be allowed to

explain the circumstances surrounding the disappearance of these records.  The Court

declines to impose the additional sanctions Pauls requests.

*ISP Recordings.*  As for the ISP recordings, the Court will allow a similar

instruction at trial, allowing the jury to draw a negative inference.  Defendants will be

allowed to explain the circumstances surrounding their inability to locate the recordings.

The Court denies Pauls' request for additional sanctions, including the request for an order

prohibiting the introduction of any investigation performed by the Idaho State Police.

That the police investigated the matter is uncontroverted.  Further, plaintiff had the

opportunity to depose the individuals whom the police interviewed as well as, presumably,

the police officers themselves. There is no assertion that there was a recorded interview of a witness who was not available for deposition. *Cf. Med. Lab. Mgmt. Consultants*, 306 F.3d at 824-25 (absence of defendant's bad faith in losing evidence and plaintiff's failure to pursue other evidence formed proper basis for district court's refusal to sanction).

For these reasons, the motion for evidentiary sanctions will be granted in part and denied in part.

## ORDER

**IT IS ORDERED:**

1.      Defendants' Motion to Dismiss (Dkt. 47, 66) is DENIED.

2.      Defendant Gibson's Motion for Partial Summary Judgment (Dkt. 45) is GRANTED.

3.      Defendants Green and Adams County's Motion for Summary Judgment (Dkt. 41) is GRANTED in part and DENIED in part. The denial relates to Adams County's motion for summary judgment of Pauls' state-law claims. Adams County withdrew the support for this aspect of the motion. *See* Dkt. 49.

4.      Plaintiff's Motion to Compel and for Evidentiary Sanctions (Dkt. 53) is GRANTED in part and DENIED in part.

5.      Defendants' Motion to Strike the Affidavit of Dr. Kupers (Dkt. 59, 63, 65) is GRANTED in part and DENIED as moot in part. It is further ordered that the discovery period will be re-opened to allow defendants to depose Dr. Kupers and retain their own

expert(s), if desired.  The parties are ordered to submit a proposed order containing an expert discovery schedule.

5.      The parties shall attend at least one Alternative Dispute Resolution (ADR) session before this case will be set for trial. The parties may contact the Court's ADR Coordinator, Susie Boring-Headlee, at 208-334-9067, to arrange the session.

6.      The parties shall attend a **Telephone Status Conference** on **October 12, at 10:00 a.m. (MT).**  Plaintiff is directed to initiate the conference call.  The Court can be reached at (208) 334-9145.  The Court prefers that a conference operator be used to place the conference call.

DATED:  **September 7, 2011**



Honorable B. Lynn Winmill
Chief U. S. District Judge